**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES LEE DORSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16-cv-07884 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| GALIAH OBAISI, Independent Executor | ) | |
| of the Estate of Saleh Obaisi, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff James Lee Dorsey, an inmate in the custody of the Illinois Department of

Corrections ("IDOC"), has brought this suit against Defendant Wexford Health Sources, Inc.

("Wexford"), the private healthcare provider with which the IDOC has contracted to provide care

to its inmates, and several individual Wexford employees who treated him: Dr. Saleh Obaisi,[1]

Dr. Alma Martija, LaTanya Williams, and Dr. Christian Okezie.[2] In his Second Amended

Complaint ("SAC"), Dorsey claims that the medical care he received at Stateville Correctional

Center ("Stateville") for his rectal bleeding and self-diagnosed anemia was unconstitutionally

inadequate. He asserts three claims against each Defendant: (1) deliberate indifference to his

serious medical needs in violation of the Eighth Amendment, asserted pursuant to 42 U.S.C.

§ 1983 (Count I); (2) First Amendment retaliation, also brought under § 1983 (Count II); and (3)

intentional infliction of emotional distress under Illinois state law (Count III). Defendants

---

[1] Dr. Obaisi passed away on or about December 24, 2017. Galiah Obaisi, the executor of his estate, has substituted for him as a party in this matter.

[2] Defendants James Baldwin and Sherwin Miles were dismissed by stipulation of the parties. (Dkt. Nos. 243, 245.) The Second Amended Complaint also named three Doe Defendants (Lidia "Doe", Wendy "Doe", and Michelle "Doe"), along with Walter Nicholson. Since those Defendants were never served and have not appeared, they are dismissed pursuant to Fed. R. Civ. P. 4(m).

Wexford, Dr. Martija, Dr. Okezie, Dr. Obaisi, and Williams have each filed a motion for summary judgment. (Dkt. Nos. 303, 307, 311, 315, 319.) For the reasons that follow, Defendants' motions are granted.

## BACKGROUND

The following facts are drawn from the parties' submissions under Local Rule 56.1.[3] Where disputed, the Court views the facts in the light most favorable to Dorsey as the nonmoving party. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

### I.    Dorsey's Course of Treatment

Dorsey was housed at Stateville from 2009 to 2021. (Plaintiff's Response to Dr. Martija's Statement of Material Facts ("PRSF") ¶ 1, Dkt. No. 334.)[4] The claims in this case concern prolonged rectal bleeding that Dorsey experienced while at Stateville, which he claims led to anemia.

Dorsey reported rectal bleeding in early 2008, when he complained about two episodes of bright red blood in his stool along with constipation. (*Id.* ¶ 15.) Dorsey claims that during

---

[3] Defendants contend that Dorsey's Rule 56.1 submissions are improper because they include unsupported factual assertions. But Dorsey's filings do not impede the Court's ability to assess the record. So, to the extent Defendants request that the Court formally strike Dorsey's submissions, their request is denied. *See Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt. v. Vill. of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012) ("[M]otions to strike are disfavored in summary judgment proceedings unless they expedite the Court's work."); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[A] district court has broad discretion to require strict compliance with Local Rule 56.1."). To be clear, however, "consistent with its obligations under the federal and local rules, the Court will rely only on material statements of fact which are both admissible and supported by the record." *Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt.*, 879 F. Supp. 2d at 960.

[4] Even though Defendants are represented by the same counsel, each filed their own summary judgment motion supported by a separate Rule 56.1 statement of material facts. Accordingly, Dorsey filed separate responses to the statements of material facts. The statements and responses are substantially identical except for a handful of Defendant-specific details in each; thus, for ease of reference, for facts common to all Defendants, the Court cites Dr. Martija's statement (Dkt. No. 309) and Dorsey's response to Dr. Martija's statement (Dkt. No. 334).

profuse bleeding episodes, his underwear and pants would be soaked through with blood. (Defendants' Response to Plaintiff's Statement of Additional Facts ¶ 5, Dkt. No. 346.) At the time, Dorsey told the doctor who saw him that he had no family history of colon cancer. (PRSF ¶ 15.) He was given a laxative and referred to an optometrist. (*Id*.) Dorsey repeated the complaint about blood in his stool at a follow-up visit in April 2008, again denying any family history of colon cancer. (*Id*.) No further documented complaints of rectal bleeding appear in the record until 2012. (*Id*. ¶ 16.)

Dr. Martija saw Dorsey on three occasions in 2014 and 2015. (*Id*. ¶¶ 41, 45, 50.)  At Dorsey's annual physical in November 2014, Dr. Martija conducted both an internal and an external rectal examination and obtained a stool sample for guaiac testing. (*Id*. ¶ 41.) Neither the exam nor the guaiac test revealed blood. (*Id*.) Given that Dorsey was not yet 50 years old and the absence of clinical indicators, Dr. Martija did not recommend a colonoscopy. (*Id*. ¶ 43.) Yet Dorsey believes that a colonoscopy should have been recommended at that time. (*Id*.) When Dr. Martija next saw Dorsey in January 2015 at a hypertension clinic, he reported no complaints. (*Id*. ¶ 45.) In June 2015, Dr. Martija evaluated him for groin pain, which she attributed to poor posture, weak core strength, and his use of a crutch. (*Id*. ¶ 50.)

From 2012 to 2017, Dorsey was also treated by Dr. Obaisi, then Stateville's medical director. (Plaintiff's Response to Dr. Obaisi's Statement of Material Facts ¶ 41, Dkt. No. 335.) Dorsey contends that Dr. Obaisi once detected a "nodule" but never referred him for a colonoscopy. (*Id*. ¶ 9.) The medical records show, however, that during this period Dorsey's stool tests remained negative and his blood counts remained within normal limits. Dr. Obaisi prescribed medications as needed, and there is no dispute that he treated Dorsey regularly during these years. (*Id*. ¶ 42.)

In 2018, Dorsey was seen by Williams, a physician assistant, for various complaints including dizziness and chronic low-back pain. (Plaintiff's Response to Williams's Statement of Material Facts ¶ 41, Dkt. No. 338.) Dorsey claims that Williams ignored his complaints and, on occasion, refused to see him, remarking to an officer that she did not want to see him because Dorsey was suing her. (*Id*. ¶ 6.) Dorsey admits, however, that his visits with Williams were "about different issues" unrelated to rectal bleeding or anemia, and that she never performed a rectal exam. (*Id*. ¶ 7.) The same year, Dr. Okezie took over as medical director at Stateville. (Plaintiff's Response to Dr. Okezie's Statement of Material Facts ¶ 2, Dkt. No. 336.) Dorsey alleges that Dr. Okezie refused to treat certain complaints and once threatened to testify against him if he filed a lawsuit. (*Id*. ¶ 6.) He further speculates that Dr. Okezie interfered with his epidural injections. (*Id*.) But those injections were part of Dorsey's treatment for his lumbar-sacral degenerative joint disease, which the parties agree is unrelated to rectal bleeding or anemia. (*Id*. ¶ 40.)

In 2019, Dorsey's lab results briefly showed mild anemia, which was treated with iron supplements. (PRSF ¶ 19.) Though disputed by Dorsey, Defendants claim that his hemoglobin levels normalized by May 2019. (*Id*. ¶ 69.) Stool tests in late 2019 were negative. (*Id*. ¶ 20.)

In June 2020, Dorsey was referred for a colonoscopy at the University of Illinois Chicago ("UIC"), and the referral was approved later that month. (*Id*. ¶ 21.) Three separate stool samples taken in July 2020 all tested negative for occult blood. (*Id*. ¶ 22.) In January 2021, Dr. Edward Villa of UIC recommended a colonoscopy. (*Id*. ¶ 26.) Dorsey told Dr. Villa he had no family history of colon cancer. (*Id*. ¶ 25.) In February 2021, Dorsey was referred to and approved for a colonoscopy. (*Id*. ¶ 28.)

On July 2, 2021, Dorsey underwent the colonoscopy, which revealed hemorrhoids but no cancer or other abnormalities. (*Id*. ¶ 31.) Dorsey reported a family history of colon cancer during this visit—the first such report in the record. (Rule 26(a)(2)(B) Report by Dr. Kennon Tubs at p. 38, Dkt. No. 310-5.) Dr. Villa recommended another screening in ten years. (*Id*.) At a follow-up visit in July 2021, Dr. Villa confirmed hemorrhoids as the source of Dorsey's rectal bleeding and advised that no further gastrointestinal follow-up was necessary unless his symptoms worsened. (*Id*. ¶ 32.)

After Dorsey was transferred to Pickneyville Correctional Center in October 2021, he reported at intake that he was anemic. Laboratory testing conducted one week earlier, however, showed normal hemoglobin and hematocrit levels, and subsequent testing in November and December 2021 also revealed no anemia. (*Id*. ¶ 33.)

## II. Defendants' Expert Opinions

In support of their motions for summary judgment, Defendants have offered two expert witnesses: Dr. Kennon Tubbs, a retained medical expert, and Dr. Arthur Funk, Wexford's northern regional medical director and Federal Rule of Civil Procedure 30(b)(6) designee.

Dr. Tubbs has practiced family medicine for fifteen years and is the medical director for ten county jails in Utah and Wyoming. He has experience treating anemia, rectal bleeding, and internal and external hemorrhoids, and conducting colon cancer screenings in correctional facilities. (Dr. Tubbs Depo. 8:8–20, Dkt. No. 322-5; Dr. Tubbs Report p. 1.) Dr. Tubbs reviewed Dorsey's medical records, laboratory studies, diagnostic tests, deposition transcripts, and Wexford policies. (PRSF ¶ 58.) He concluded that Dorsey experienced only two instances of mild anemia—in December 2018 and February 2019—both of which resolved promptly with iron supplementation. (*Id*. ¶ 63.) He also found that Dorsey has never suffered chronic anemia,

never required a transfusion, and sustained no lasting injury. (*Id.* ¶¶ 64, 68.) Moreover, Dorsey's treatment for hemorrhoids and temporary anemia—including repeated bloodwork, stool testing, and referral for colonoscopy—was appropriate and consistent with the standard of care. (*Id.* ¶ 78.) Dr. Tubbs further opined that none of the Defendants deviated from that standard of care or caused Dorsey any injury. Rather, Dorsey was evaluated repeatedly by multiple treaters and underwent appropriate laboratory testing and diagnostic studies, and those evaluations revealed no evidence of a serious medical condition requiring additional imaging, testing, or specialty consultation. (*Id.* ¶ 79.)

Moreover, Dr. Tubbs noted that it is not the standard of care for a patient's entire medical record or list of problems to be addressed during each medical visit. (*Id.* ¶ 66.) Dr. Tubbs also noted that, under then-prevailing guidelines, patients without comorbidities or a family history of colon cancer were recommended to undergo colonoscopies beginning at age 50 (a threshold subsequently lowered to 45 in 2021). (Dr. Tubbs Dep. 41:6-17.) Dorsey, born September 22, 1967, was 47 years old when Dr. Martija examined him in 2014, and he did not turn 50 until September 2017. (Dorsey Medical Records p. 9, Dkt. No. 322-2.) It is undisputed that no qualified medical provider, within IDOC or externally, has offered any opinion contrary to Dr. Tubbs's conclusions. (PRSF ¶ 80.)

Dr. Funk, a doctor specializing in internal medicine, has supervised Stateville and other facilities since 2005. (Plaintiff's Response to Wexford's Statement of Material Facts ¶ 30, Dkt. No. 337.) He testified consistently with Dr. Tubbs's conclusions (PRSF ¶ 75), while providing additional context regarding Wexford's institutional practices. He explained that inmate medical care is subject to multiple checks and balances: patient complaints are recorded in medical charts; grievances are reviewed by the health care administrator and, if warranted, may be

elevated for regional oversight; and chronic-care scheduling is governed by IDOC directives. (Plaintiff's Response to Wexford's Statement of Material Facts ¶¶ 32, 34, 62.) Individual treatment decisions, however, remain within the independent judgment of the treating provider. (*Id*. ¶ 38.) Dr. Funk further testified that Wexford physicians' compensation is not tied to limiting referrals, and that specialty services at UIC—such as Dorsey's colonoscopy—carried no cost to Wexford. (*Id*. ¶ 35.) Based on his review, Dr. Funk opined that Dorsey received responsive care consistent with the standard of practice, and that there was no indication of medically necessary care being delayed or denied. (*Id*. ¶ 39.)

### III. Dorsey's Grievances

During his incarceration at Stateville, Dorsey submitted a substantial number of grievances relating to his medical care. Although Dorsey raised a variety of medical concerns over the years, including chronic back pain, groin pain, leg swelling, chest pain, and heart palpitations, treatment for conditions other than Dorsey's rectal bleeding and potential anemia are not at issue in this lawsuit. The parties agree that Dorsey's groin pain was attributable to spinal narrowing and that his leg swelling bore no relation to rectal bleeding or anemia. (PRSF ¶ 72.) Dorsey maintains that he feared his rectal bleeding was life-threatening, possibly indicative of colon cancer, and that his repeated requests for additional testing were ignored or delayed. He contends that his sick-call visits were sometimes rescheduled or canceled, and he highlights the passage of time between his first reports of bleeding in 2008 and his eventual referral for a colonoscopy in June 2020, which was performed in July 2021.

The record reflects nineteen grievances naming Dr. Obaisi, fifteen naming Dr. Martija, nine naming Williams, and one naming Dr. Okezie. (Dorsey Grievances p. 1, 340-9). These

grievances were concentrated between 2014 and 2018, and often named multiple providers at once. Dorsey's grievances as to each Defendant are summarized as follows:

- Dorsey complains that Dr. Obaisi failed to detect or address his rectal bleeding, "did nothing" when Dorsey first reported it, and refused to send him for a colonoscopy. Dorsey further claims that Dr. Obaisi retaliated against him by taking away medical permits for restraints and ice, refusing to provide adequate treatment, and denying him appointments "multiple times." Dorsey's first grievance was filed on September 19, 2014, and was followed by a steady stream of grievances through mid-2016, with additional filings as late as October 27, 2017. Despite these nineteen complaints, Dorsey continued to be seen regularly by Dr. Obaisi during this period.

- Dr. Martija purportedly disregarded Dorsey's reports of bleeding and groin pain, "refused to do anything" for him, discontinued or refused to renew his medications, and at times refused to see him. Dorsey's grievances began in April 2015 and continued intermittently through September 2017. The record shows that Dr. Martija continued to evaluate Dorsey at chronic clinics and for physicals when and after these fifteen grievances were filed.

- According to Dorsey, Williams ignored his complaints about heart and blood conditions, refused to provide urgent care or schedule appointments with the Medical Director, and denied him renewal of pain medications. Dorsey claims that Williams intentionally refused to see him despite valid sick-call passes and told a correctional officer that she did not want to see him because she was "being sued anyway." Dorsey filed nine grievances during the time period of 2015 to

8

2017, the same general timeframe during which he filed grievances against Dr. Obaisi and Dr. Martija. Williams likewise continued to see Dorsey during chronic care visits.

- Doresy claims that Dr. Okezie refused to treat his complaints of high blood pressure, dizziness, and heart palpitations, stating he would only address back issues. Dorsey further alleges that Dr. Okezie ignored him on multiple occasions, threatened that if Dorsey filed a lawsuit, he would testify that "there is nothing wrong" and be believed because he was a doctor, and interfered with Dorsey's epidural injections. Dorsey filed one grievance against Dr. Okezie, dated September 21, 2018, after which Dorsey was still seen and treated by him.

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). While facts and reasonable inferences are construed in the light most favorable to the non-moving party, "[the Court's] favor . . . does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotation marks omitted). A court must grant summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

9

## I.      Deliberate Indifference (Count I)

Dorsey contends that Defendants violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs—that is, by consciously disregarding a substantial risk to his health and failing to take reasonable measures to address his conditions.

The Eighth Amendment requires prisons to provide adequate medical care to prisoners. *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024). Every claim by a prisoner that he has not received adequate medical treatment is not a violation of the Eighth Amendment, however. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Instead, to hold Defendants responsible for constitutionally inadequate care, Dorsey must establish that they acted with "deliberate indifference to [his] serious medical needs." *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim has two components: courts "first examin[e] whether a plaintiff suffered from an objectively serious medical condition, and then determine[e] whether the individual defendant was deliberately indifferent to that condition." *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (internal quotation marks omitted). This requires more than negligence or malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

When a plaintiff claims deliberate indifference based on a delay in providing treatment, he must present not only evidence of deliberate indifference but also "verifying medical evidence" that the delays, rather than the underlying conditions, caused harm. *McMillen v. Wexford Health Sources, Inc.*, No. 23-1836, 2025 WL 2543981, at *2 (7th Cir. Sept. 4, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 678 (7th Cir. 2023)); *see also Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). Expert testimony counts towards this

requirement, but so do other forms of evidence. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 347–48 (7th Cir. 2018). "[N]on-expert evidence is sufficient as long as it permits the fact-finder to determine whether the delay caused additional harm." *Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011). It is the "rare" case that does not meet this threshold at summary judgment. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010).

Moreover, when the dispute concerns whether a physician should have referred a patient to a specialist or ordered additional testing, a prisoner is "not entitled to demand specific care," so long as the treatment provided reflects medical judgment, *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), and medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field," *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). The Court defers to treatment decisions by medical professionals unless there is evidence that "no minimally competent professional would have so responded under those circumstances." *Walker v. Wexford Health Sources, Inc*., 940 F.3d 954, 965 (7th Cir. 2019) (internal quotations omitted).

To satisfy the first element of a deliberate indifference claim, Dorsey must demonstrate that he suffered from an objectively serious medical condition. A medical need is objectively serious when the condition "is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). Although Defendants' experts opine that Dorsey never suffered from a serious condition, the Court assumes for present purposes that a reasonable jury could find that prolonged rectal bleeding from hemorrhoids constitutes an objectively serious medical need—particularly where, as Dorsey alleges, the rectal bleeding was sufficiently profuse so as to soil his clothes. *See, e.g., Bogan v. Wexford Health Sources*, No. 15 C 7631, 2016 WL 4077110, at *2 (N.D. Ill. July 31, 2016) (recognizing that

11

blood in stool qualifies as an objectively serious medical condition). The Court therefore turns to whether any Defendant acted with deliberate disregard of a serious risk to Dorsey's health.

The Court considers deliberate indifference on a defendant-by-defendant basis, because "individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). Thus, to show deliberate indifference, "a plaintiff must establish that [the] official knows of and disregards an excessive risk to inmate health or safety or that the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotation marks omitted). Purposeful conduct is not required, but conversely, mere negligence is not enough. *Id.* Courts must also "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016). Here, the record cannot support such a finding as to any of the individual Defendants.

### A.     Dr. Martija

Dr. Martija examined Dorsey three times. In November 2014, she performed a complete annual physical, including a rectal exam and stool guaiac test, both of which were negative. (PRSF ¶ 42.) In January 2015, Dr. Martija saw Dorsey in the chronic hypertension clinic, where he raised no subjective complaints. (*Id*. ¶ 45.) In June 2015, she evaluated him for groin pain, which she attributed to posture and core weakness, recommending weight loss, continuation of physical therapy, and over-the-counter pain medications. (*Id*. ¶ 50.)

Dorsey's deliberate indifference claim against Dr. Martija boils down to his disagreement with her decision not to order specialized testing in the form of a colonoscopy before age 50. But

courts repeatedly caution against second-guessing medical judgment when providers act within accepted standards. *Pyles v. Fahim*, 771 F.3d 403, 409–11 (7th Cir. 2014) (holding that a refusal to order a specialist referral, absent compelling need, is not deliberate indifference). Instead, "[w]hen a plaintiff's claim focuses on a medical professional's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Johnson*, 5 F.4th at 825 (internal quotation marks omitted). The plaintiff's preference for a different—often, more aggressive—course of treatment does not necessarily mean that the treatment he did receive was constitutionally inadequate. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). And that is all Dorsey offers here—his own preference for a different approach to his complaints.

On the other hand, Defendants' expert, Dr. Tubbs, opined without contradiction from any other medical professional, that Dr. Martija's examinations and treatment met the applicable standard of care. (PRSF ¶ 74.) He explained that, given Dorsey's age, negative stool guaiac, and unremarkable rectal exam, there was no clinical basis to order a colonoscopy or hematology referral at that time. (*Id*. ¶ 61; Dr. Tubbs Report p. 61–62.) In short, there is no genuine dispute that Dr. Martija's decisions reflected medical judgment, not deliberate indifference. Accordingly, Dr. Martija is entitled to summary judgment on Count I.

### B. Dr. Obaisi

Similarly, Dorsey claims that Dr. Obaisi, who treated him between 2012 and 2017, was deliberately indifferent when he failed to order a colonoscopy despite once detecting a nodule. The undisputed facts, however, show years of negative stool tests and only two brief episodes of mild anemia, both of which occurred after Dr. Obaisi's death. And Dr. Tubbs opined that nothing in Dorsey's course of care suggested that a serious condition was ignored by Dr. Obaisi.

(Plaintiff's Response to Dr. Obaisi's Statement of Material Facts ¶ 62.) Again, Dorsey's "mere disagreement with a doctor's medical judgment is not enough" to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Without evidence that the delay in ordering the colonoscopy caused Dorsey harm, his deliberate indifference claim cannot proceed. Accordingly, Dr. Obaisi is granted summary judgment on Count I.

### C.      Williams

Dorsey also claims that Williams was deliberately indifferent to his medical needs. But his own testimony undercuts that assertion. He admits that his medical visits with Williams "were about different issues" unrelated to rectal bleeding or anemia, and that Williams never examined his rectal area. (Plaintiff's Response to Williams's Statement of Material Facts ¶ 7, Dkt. No. 338.) Because the Eighth Amendment claim in this case is limited to rectal bleeding and anemia, no objectively serious medical need was before Williams during her treatment of Dorsey. Moreover, there is no evidence that Williams knew how serious his rectal bleeding was. Without such a predicate condition, the deliberate indifference inquiry cannot proceed further, and summary judgment is warranted in Williams's favor. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (holding that to prove deliberate indifference, the prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."

### D.      Dr. Okezie

Dorsey next points to Dr. Okezie, who served as Stateville's medical director for approximately seven months in 2018. Dorsey alleges that Dr. Okezie refused to treat his complaints of dizziness, headaches, and palpitations, instead stating that Dorsey would only be treated for back-related issues. (Plaintiff's Response to Dr. Okezie's Statement of Material Facts

¶ 6, Dkt. No. 336.) To the extent Dorsey also attributes groin pain to Dr. Okezie's care, the parties agree that his groin pain stemmed from spinal narrowing rather than rectal bleeding or anemia. (*Id.* ¶ 63.) Because no objectively serious medical need relevant to this case was before Dr. Okezie, the deliberate indifference analysis cannot proceed further, and summary judgment is warranted in Okezie's favor.

***

In sum, Dorsey has not carried his burden of bringing forward evidence from which a reasonable jury could conclude that any of his Stateville treaters was deliberately indifferent to his serious medical condition of rectal bleeding associated with what turned out to be hemorrhoids. The Court recognizes the possibility that, in some circumstances, a significant delay in referral for a colonoscopy could support a deliberate indifference claim. If Dorsey had in fact been suffering from colon cancer, a years-long delay in diagnosis might have caused serious harm by allowing the disease to progress, making treatment more difficult. In such a case, the alleged inaction of medical provider could well be relevant to causation. But those are not the facts here.

The undisputed record shows that Dorsey's condition was monitored through 34 blood draws between 2008 and 2021, with only two showing mild and temporary anemia. (*Id.* ¶ 52.) He was subject to evaluation by multiple treaters, repeat diagnostic testing, and eventually a referral for a colonoscopy. There was no progression of his symptoms, no injury exacerbated by the claimed delay in sending him for a colonoscopy, and no indication that earlier intervention would have prevented a serious outcome (or, for that matter, would have altered his outcome at all). Dorsey's central fear was that he might have colon cancer or that his bleeding was severe enough to cause lasting anemia, but that was not borne out by the objective evidence. Dorsey's

subjective and lay opinion about what his medical treatment should have been is not sufficient to defeat summary judgment. *Hatchett v. Wexford Health Sources, Inc.*, No. 17-CV-06060, 2024 WL 4346670, at *5 (N.D. Ill. Sept. 30, 2024). He has come forward with no verifying medical evidence to dispute any of the treatment decisions by Defendants, with Dorsey relying solely on his own beliefs. At most, the record reflects Dorsey's disagreement with his treater's medical judgment or perhaps negligence, neither of which amount to deliberate indifference under the Eighth Amendment.

## II.     Retaliation (Count II)

Dorsey also claims that Defendants violated his constitutional rights by refusing to address his medical complaints in retaliation for his submission of medical care requests and grievances.

This type of retaliation claim is analyzed under the First Amendment. To prevail, Dorsey must show that (1) he engaged in protected activity; (2) he suffered an adverse action that would deter a person of ordinary firmness from exercising First Amendment rights; and (3) the protected activity was a motivating factor behind the adverse action. *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). The "motivating factor" requirement "amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). Suspicious timing alone is rarely sufficient to create a triable issue on the motivating factor element, especially where an alternative motive exists. *Id.* If the plaintiff is able to satisfy this *prima facie* case, the burden shifts to the defendant "to rebut with evidence that the [defendant's animus] though a sufficient condition was not a necessary condition of the conduct, *i.e.*, it would have happened anyway." *Green v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). If the defendant can make such a showing, the plaintiff "must then demonstrate that the

16

defendant's proffered reasons for the decision were pretextual and that the retaliatory animus was the real reason for the decision." *Zellner v. Herrick*, 639 F.3d 371, 378–79 (7th Cir. 2011).

Several Defendants dispute that they were aware of any grievances Dorsey filed against them notwithstanding the large number. Dr. Funk testified that every medical grievance triggers an investigation by the health care administrator and subsequent review by the grievance committee, suggesting the subjects of the grievances would be notified. Nonetheless, Dr. Martija and Wiliams testified that they did not know grievances had been filed. For purposes of summary judgment, the Court assumes without deciding that Dorsey can show a genuine dispute of fact as to whether the individual Defendants knew about his many complaints. Even assuming that each Defendant was aware of the grievances, Dorsey has failed to produce evidence of causal link between his protected activity and any adverse action.

### A.    Dr. Martija

Dorsey claims that Dr. Martija retaliated against him by refusing to see him and by discontinuing medications after he filed grievances. But the only support for this assertion is Dorsey's own say-so. The medical records show that Dr. Martija continued to provide treatment within the standard of care: in 2014, she performed a rectal exam and stool guaiac test (both negative); in January 2015, she saw him in the hypertension clinic (where he voiced no gastrointestinal complaints); and in June 2015, she addressed his groin pain. Dorsey identifies no instance where Dr. Martija withheld or altered care or discontinued medications in response to grievances. In fact, the only evidence in the record is that she exercised sound professional judgment. Moreover, Dr. Martija states that she only ever missed appointments because of lockdowns. Without corroborating evidence beyond Dorsey's statements, no reasonable jury could find that Dr. Martija's actions amounted to retaliation in violation of the First Amendment.

*See FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (holding that conjecture is not enough to withstand summary judgment). Accordingly, the retaliation claim against Dr. Martija fails as a matter of law.

### B.      Dr. Obaisi

Dorsey next contends that Dr. Obaisi retaliated against him by withdrawing medical permits for medical restraints and ice in response to grievances. It is undisputed that, beginning in September 2014 and continuing past 2015, Dorsey filed more grievances against Dr. Obaisi than any other Defendant. Yet even crediting that Dr. Obaisi was aware of these filings, the record does not establish a materially adverse action. While the temporary removal of permits may have caused inconvenience, Dr. Obaisi also renewed permits on multiple occasions—including on July 6, 2015, the same day Dorsey filed a grievance alleging refusal to treat. (*See* Dr. Tubbs Report at p. 22.) These renewals undermine any inference that the permit decisions were intended to punish protected activity. Moreover, temporary the removal of ice and restraint permits, does not rise to the level of an adverse action that would chill an ordinary prisoner of reasonable firmness from filing grievances—particularly given that the permits were later renewed. Nor does the record support causation. Dr. Obaisi continued to evaluate Dorsey, prescribed medications, and addressed his complaints consistent with medical judgment. Dorsey has not created a genuine issue of facts as to whether Dr. Obaisi did not act within the bounds of professional judgment. Accordingly, the retaliation claim against Dr. Obaisi also fails as a matter of law.

### C.      Williams

Dorsey also alleges that Williams retaliated by refusing to see him, denying him medication renewals, and once telling an officer she did not want to see Dorsey because she was

being sued. Even if this statement is credited, it does not support an actionable retaliation claim. The record shows Williams treated Dorsey repeatedly in 2018, prescribed medications including fiber, Metamucil, Colace, pain medications, muscle relaxants, Naproxen, hemorrhoid creams, and recommended lifestyle modifications and referrals. Dorsey identifies no instance where Williams actually denied care. A single comment or isolated refusal, without evidence of deprivation of treatment, does not amount to an adverse action. Absent proof that grievances motivated any change in Williams's medical decisions, this claim cannot survive summary judgment.

### E.    Dr. Okezie

Finally, Dorsey's retaliation claim against Dr. Okezie rests on the allegation that Dr. Okezie interfered with his epidural injections and told Dorsey that "if you file a lawsuit, I will testify that there is nothing wrong with you and I will be believed because I am a doctor and you are an inmate." Dr. Okezie denies making this statement, (Okezie Dec., Dkt. No. 341-2), but for summary judgment purposes the Court credits Dorsey's account.

Even accepting Dorsey's version of their conversation, Dorsey's claim fails on the remaining elements. First, the alleged remark—essentially a promise about what testimony Dr. Okezie would give in future litigation—is not a threat to withhold treatment or impose punishment; it is, at most, a prediction about testimony in potential litigation. Such a comment, unaccompanied by any deprivation within Dr. Okezie's control, does not rise to the level of a materially adverse action. The alleged statement did not threaten discipline, punishment, or deprivation within Dr. Okezie's control, and Dorsey did not present evidence of any injury resulting from those threats; it is also undisputed that these threats were not accompanied by any tangible change in Dorsey's medical care. *See Hoskins v. Swisher*, No. 20-CV-302-RJD, 2023

WL 2600214, at *5 (S.D. Ill. Mar. 22, 2023) (finding that a verbal threat alone is insufficient to support a retaliation claim). Second, Dorsey offers no evidence of causation. There is no evidence that epidural injections were ever withheld or altered. Dorsey's assertion of interference remains wholly speculative. The record instead shows that Dr. Okezie evaluated Dorsey for groin and spinal pain, prescribed medications, and otherwise provided treatment consistent with medical judgment during the relevant period. That Dr. Okezie continued to treat Dorsey after the filing of grievances undercuts any inference that his decisions were motivated by retaliatory animus.

As such, the retaliation claim against Dr. Okezie fails as a matter of law.

### III.     IIED (Count III)

Finally, Dorsey asserts claims against all Defendants for IIED under Illinois common law. To prevail, he must establish that (1) Defendants' conduct was extreme and outrageous; (2) Defendants intended to cause, or knew, there was a high probability of causing severe emotional distress; and (3) such distress in fact occurred. *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 80 (Ill. 2003). The "extreme and outrageous" requirement sets a demanding standard: conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016).

Dorsey characterizes Defendants' conduct as an intentional and unwarranted delay in treatment, alleging that for thirteen years his requests for additional testing were ignored, leaving him to suffer pain and anxiety over the possibility of cancer. He argues that Defendants knew or should have known such delay would cause severe distress given all his medical complaints, particularly because an inmate has no ability to secure outside treatment apart from prison medical staff. *See Hardy v. IDOC*, 2016 WL 7099964 (S.D. Ill. Dec. 6, 2016); *Moore v.*

*Abernathy*, No. 11 C 3487, 2015 WL 222685, at *5 (N.D. Ill. Jan. 15, 2015) (holding that, in determining whether conduct is extreme and outrageous, courts consider (1) the degree of control the defendant has over the plaintiff; (2) "whether defendant reasonably believed its objective was legitimate"; and (3) "whether the defendant was aware the plaintiff was peculiarly susceptible to emotional distress, by some reason of some physical or mental peculiarity") (quoting *Franciski v. Univ. of Chi. Hosps.,* 338 F.3d 765, 769 (7th Cir. 2003).

But even accepting Dorsey's account, the conduct he describes cannot be deemed "extreme and outrageous" under Illinois law. As this Court has already concluded, the record does not support a claim of deliberate indifference. And where a plaintiff cannot establish deliberate indifference—a lower standard—it necessarily follows that the conduct does not rise to the heightened threshold of extreme and outrageous behavior. *See Robinson v. Wexford Health Sources, Inc.,* No. 17-cv-08556, 2020 WL 5110385, *5 (N.D. Ill. Aug. 31, 2020) (citing cases). The record shows that Dorsey was evaluated repeatedly, received bloodwork, medication, and referrals, and ultimately underwent a colonoscopy. That his care did not proceed on the timetable he preferred does not transform clinical judgment into actionable misconduct.

Nor has Dorsey presented evidence of the severe emotional distress required for this tort. He identifies no medical diagnosis, treatment, or disabling effects tied to his emotional state; rather, he describes the frustration and worry that naturally accompany disputes over medical care. Such feelings and fears, while perhaps understandable, do not amount to the type of "severe distress" that Illinois law requires for IIED.

Because the conduct was not extreme and outrageous and the evidence of distress is lacking, no reasonable jury could find for Dorsey on this claim. Summary judgment is therefore warranted for all individual Defendants on Count III.

IV.     **Claims against Wexford**

Finally, Dorsey asserts claims against Wexford, alleging that Wexford maintained cost-cutting policies that delayed or denied necessary care.

To determine whether a private corporation acting under color of law, as opposed to its employees, is responsible for the alleged constitutional deprivation, courts use the test for municipal liability set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978)*. See, e.g.*, *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). To establish *Monell* liability, a plaintiff must show that the constitutional violation was caused by an unconstitutional policy, custom, or practice of the corporation itself. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014). A plaintiff may establish *Monell* liability based on any one of three recognized theories: (1) the entity has an official policy adopted and promulgated by its officers that caused the alleged constitutional violation; (2) the entity maintained a widespread and well-settled custom or practice of unconstitutional conduct; (3) or a final policymaker for the entity made a deliberate decision that resulted in the constitutional deprivation. *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021). Additionally, a single constitutional violation is generally insufficient to establish *Monell* liability, unless the plaintiff can show that the alleged incident was part of a larger pattern of conduct. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022).

Dorsey attempts to hold Wexford liable through his claims against the individual medical Defendants. But of course, Dorsey cannot pursue liability for Wexford simply based on the fact that it supervised employees that committed a constitutional violation. The law of this Circuit is clear that there is no *respondeat superior* liability under § 1983. *Shields*, 746 F.3d at 790. Moreover, because the Court has already determined that Dorsey cannot establish that any

22

individual Defendant violated his constitutional rights, there is likewise no underlying injury that could support corporate liability. Moreover, the record contains no evidence of any express policy, widespread practice, or policymaker decision that would have caused the alleged constitutional violations. Accordingly, Wexford is entitled to summary judgment on all claims against it.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (Dkt. Nos. 303, 307, 311, 315, 319) are granted. The Clerk will enter judgment in favor of Defendants Wexford, Dr. Martija, Dr. Obaisi, Dr. Okezie, and Williams as to all claims against them. This case will be closed.[5]

ENTERED:

Dated:  September 30, 2025

Andrea R. Wood
United States District Judge

---

[5] The Court extends its appreciation to Dorsey's counsel, Scott Robert Koch, for accepting this assignment through the Northern District of Illinois's pro bono program.